## IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

| | | |
|---|---|---|
| RACHEL WESTBROOK, as Wrongful Death Representative of Antonio Davis, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 2:23-cv-02094-SHL-atc |
| FLOYD BONNER, JR., et al., | ) ) | |
| Defendants. | ) | |

---

## ORDER GRANTING DEFENDANTS MICHAEL PARKER, ANTONIO BUFORD, NATASHA WILLIAMS, FILMORE VARNER, AND SHELBY COUNTY, TENNESSEE'S MOTION FOR SUMMARY JUDGMENT AND DENYING AS MOOT DEFENDANTS SHERIFF FLOYD BONNER AND CHIEF JAILER KIRK FIELDS'S MOTION FOR JUDGMENT ON THE PLEADINGS

Before the Court are Defendants Michael Parker, Antonio Buford, Natasha Williams, Filmore Varner, and Shelby County, Tennessee's (collectively "Shelby County Defendants") Motion for Summary Judgment (ECF No. 39), filed February 23, 2024, Plaintiff Rachel Westbrook's, as wrongful death representative of Antonio Davis, response (ECF No. 44), filed March 29, 2024, the Shelby County Defendants' reply (ECF No. 46), filed April 12, 2024, Defendants Sheriff Floyd Bonner and Chief Jailer Kirk Fields's Motion for Judgment on the Pleadings (ECF No. 38), filed February 23, 2024, Westbrook's response (ECF No. 45), filed March 29, 2024, and Bonner and Fields's reply (ECF No. 47), filed April 12, 2024. For the following reasons, Shelby County Defendants' motion for summary judgment is **GRANTED** and Bonner and Fields's motion for judgment on the pleadings is **DENIED AS MOOT**.

## BACKGROUND[1]

Antonio Davis's incarceration at the Shelby County Jail began in January 2016.  (ECF No. 39-1 at PageID 196.)  On December 2, 2021, Davis was convicted of first-degree murder, second-degree murder, aggravated assault, aggravated burglary, aggravated robbery, possession of a firearm during the commission of a felony, and being a convicted felon in possession of a firearm.  (Id. at PageID 196–97.)  On February 23, 2022, he was sentenced to life imprisonment.  (Id. at PageID 197.)

Three nights later, Davis created a disturbance by yelling and kicking his cell door in the M pod of the fourth floor of the Jail.  (Id. at PageID 197; ECF No. 44-2 at PageID 458.)  The commotion prompted Defendant Officer Michael Parker—who was assigned to patrol the floor during the overnight shift—to check in with Davis.  (ECF No. 39-1 at PageID 197.)  In fact, Parker spoke to Davis on at least fifteen unique occasions between 11:01 p.m. and 4:18 a.m. on February 26–27.[2]  (Id.)

Davis felt threatened and had fears that he was being hunted.  (Id. at PageID 197; ECF No. 44-1 at PageID 454.)  He thought that he was in danger and asked to be moved to another pod.  (ECF No. 44-1 at PageID 453–54.)  Parker contacted Defendant Sergeant Antonio Buford and Defendant Lieutenant Filmore Varner for assistance.  (ECF No. 39-1 at PageID 197.)  Buford personally spoke to Davis, while Varner, at the very least, came to the pod at some point

---

[1] The Court only references undisputed facts pertinent to the Defendants' motions or material facts that were admitted in Defendants' answer to the complaint.  The undisputed facts are taken from the Parties' filings and are accepted as true for purposes of this motion.  Any disputed facts are noted, but not relied on in the decision.

[2] Westbrook's response states that "Defendant Parker interacted with Mr. Davis at least fifteen (15) different times between the hours of 11:01pm and 4:18am." (ECF No. 44 at PageID 436.)  It is an undisputed material fact that Parker interacted with Davis at least fifteen times.  The Court adopts the timeframe of the interaction between 11:01 p.m. to 4:18 a.m. as a relevant fact admitted by Westbrook.

2

during the night.[3]  (Id.; ECF No. 44-1 at PageID 454.)  Parker told Varner about Davis's

behavior at 2:00 a.m., three hours after Parker's first conversation with Davis, and Varner then

informed Defendant Gang Intelligence Unit Sergeant Natasha Williams[4] of Davis's fears and

loud proclamations.  (ECF No. 1 at PageID 6.)  One of Davis's complaints was fear of "physical

harm from gang activity,"[5] and hence why Varner and Parker sought out Williams's expertise as

the Gang Intelligence Unit Sergeant.  (ECF No. 44 at PageID 435.)  Williams was the third

officer to attend to Davis; she also observed his verbal ramblings.  (ECF No. 1 at PageID 6; ECF

No. 44 at PageID 437.)  However, Davis never asked for medical assistance (ECF No. 39-1 at

PageID 197; ECF No. 44-1 at PageID 455), and a healthcare professional never evaluated him

that night.  (ECF No. 44-2 at PageID 459.)  The last time an overnight officer interacted with

Davis was at 4:18 a.m.  (ECF No. 44 at PageID 436.)

    The morning officers found Davis unresponsive in his cell at 6:40 a.m.  (ECF No. 39-1 at

PageID 198.)  He was unable to be resuscitated and was pronounced dead later that morning at

Regional One Health.  (Id.)  Davis died from the aftereffects of "ingesting a large quantity of

methamphetamine."  (Id.)  There is no evidence of Davis using illegal drugs while he was

---

[3] Westbrook asserts in her response to defendants' statement of undisputed material facts that Varner came to the pod "because he was transferring another inmate who was suicidal." (ECF No. 44-1 at PageID 454.)

[4] The Parties seem to dispute how Williams was informed about Davis's yelling and whether Parker directly contacted Williams himself.  (ECF No. 44-1 at PageID 454.)  In the Defendants' response to Westbrook's additional statement of undisputed facts, the Parties agree that Parker "informed . . . Williams of his concerns."  (ECF No. 46-1 at PageID 665.)  But, it appears that Varner was the officer who successfully reached Williams: "Defendant Varner declined to speak to Mr. Davis or evaluate the situation himself . . . [and] [i]nstead, he instructed Defendant Williams to speak with Mr. Davis."  (ECF No. 44 at PageID 437.)  How Williams was informed is not a material fact.  The fact that Williams spoke to Davis at his cell is undisputed.

[5] This fact comes from Westbrook's response.  (ECF No. 44 at PageID 435.)

3

incarcerated prior to this incident.  (ECF No. 39-1 at PageID 196.)  Davis also had a pending

motion for new trial at the time of his death.  (ECF No. 44-2 at PageID 458.)

Westbrook asserts that Davis was either exhibiting signs of an overdose or a mental

crisis. [6]  (ECF No. 44-1 at PageID 455.)  Westbrook never argues that Davis suffered discernable

physical symptoms.  During his deposition, Parker testified that he had received training on the

side effects of fentanyl, but not for methamphetamine; furthermore, he was trained to look for

signs of distress as evidence of a possible overdose, like a detainee "on the floor, convulsing,

foaming at the mouth," before calling a medical professional for an evaluation. [7]  (ECF No. 44 at

PageID 443.)

In the aftermath of this tragic event, Parker was investigated by the Bureau of

Professional Standards and Integrity ("BPSI") for not fully following the Jail's policies for

rounds and record keeping.  (ECF No. 39-1 at PageID 198.)  He "did not make security rounds in

Fourth Floor M-Pod at the end of his shift" and only "made notation for 4-J-pod" in the logbook

as opposed to making notations for 4-M-pod as well.  (ECF No. 1-8 at PageID 45–46.)  He was

given a one-day suspension without pay.  (ECF No. 39-1 at PageID 198.)

A fully staffed Jail would typically have anywhere between fifty-five and sixty-four

positions filled on any given night.  (ECF No. 44-2 at PageID 460.)  While the exact number of

staff working on the night of February 26 is disputed (ECF No. 46-1 at PageID 667), only two of

the six officers assigned to the 4th floor were present at work that night.  (ECF No. 44-2 at

PageID 460; ECF No. 1 at PageID 5.)  In an effort to increase staffing at the Jail, Shelby County

has reduced the age requirement for correction deputies from twenty-one to eighteen, started

---

[6] Defendants dispute that Davis's "behavior on the night in question were symptoms of
methamphetamine overdose or mental health crisis."  (ECF No. 46-1 at PageID 666.)

[7] This testimony was included in Westbrook's response in opposition to the motion for
summary judgment.

giving out a $5,000 signing bonus, increased starting pay, and incentivized officers to postpone retirement.  (ECF No. 39-1 at PageID 198.)

Westbrook, Davis's mother and wrongful death representative, filed suit against Defendants on February 21, 2023.  (ECF No. 1.)  Westbrook's complaint includes four claims: 1) a 42 U.S.C. § 1983 claim against Shelby County, Sheriff Bonner, and Chief Jailer Fields for enacting policies and customs that violated Davis's constitutional rights, or in the alternative, failing to properly train or hire its employees, which allegedly led to constitutional violations; 2) a § 1983 claim against Parker, Buford, Williams, and Varner for causing a constitutional violation by deliberately ignoring Davis's medical needs in failing to obtain medical care for him; 3) a negligence claim under the Tennessee Governmental Tort Liability Act against Parker, Buford, Williams, and Varner; and 4) a loss of consortium claim against all Defendants.  (Id. at PageID 12–15.)

The Defendants filed two dispositive motions: a motion for summary judgment filed by the Shelby County Defendants (ECF No. 39), and a motion for judgment on the pleadings filed by Sheriff Bonner and Chief Jailer Fields (ECF No. 38).  First, the Shelby County Defendants argue that Davis did not suffer a constitutional rights violation, the defendant officers are entitled to qualified immunity, Shelby County is not liable under Monell,[8] and Westbrook's state law claims fail as a matter of law.  (ECF No. 39-2.)

Westbrook's response argues that the Fourteenth Amendment rather than the Eighth Amendment protected Davis at his death, a jury could find that Davis suffered a constitutional violation, the officers are not entitled to qualified immunity, and Shelby County is liable for Davis's death, even in the absence of individual liability, because Shelby County failed to

---

[8] Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978).

adequately train its officers, the County had a policy of understaffing the Jail, and Sheriff Bonner has the authority to reduce the Jail's population.  (ECF No. 44.)  Westbrook abandoned her state law claims in her response.  (Id. at PageID 450.)  The Shelby County Defendants' reply avers that Westbrook's claims fail under both the Fourteenth Amendment and the Eighth Amendment and that there is not a viable Monell claim even if a constitutional violation occurred.  (ECF No. 46.)

Defendants Sheriff Bonner and Chief Jailer Fields's Motion for Judgment on the Pleadings argues that they were not individually involved with the events surrounding Davis's death, understaffing cannot lead to individual liability, they are not liable as supervisors, and they are entitled to qualified immunity.  (ECF No. 38.)  The response takes the opposite approach to each issue (ECF No. 45), and the reply reiterates pleading shortcomings for supervisory liability and an inability to counteract qualified immunity (ECF No. 47).

## STANDARD OF REVIEW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party can prove the absence of a genuine issue of material fact by showing that there is a lack of evidence to support the non-moving party's cause.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  While the court views all evidence and factual inferences in a light most favorable to the non-moving party, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).

6

The movant has the initial burden of "demonstrate[ing] the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. The burden then shifts to the non-moving party to go beyond the pleadings and designate specific facts showing there is a genuine issue for trial. Id. at 324 (quotations omitted). Ultimately, in evaluating the appropriateness of summary judgment, the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251–52.

## ANALYSIS

Section 1983 enables plaintiffs to sue for deprivations of "any rights, privileges, or immunities secured by the Constitution and laws" by state or local officials acting under color of state law. 42 U.S.C. § 1983. It is not a stand-alone cause of action, but rather provides a cause of action for violations of rights secured by other statutes or the Constitution. See Baker v. McCollan, 443 U.S. 137, 140 (1979).

The Court first analyzes whether there is a genuine issue of material fact as to the § 1983 claim against Parker, Buford, Williams, and Varner.

## I.      Claims Against Officers

Westbrook argues that Parker, Buford, Williams, and Varner deprived Davis of his constitutional rights under the Fourteenth Amendment by acting with deliberate indifference in ignoring Davis's medical needs and failing to obtain medical care for him. (ECF No. 1 at PageID 15–16.)

In their motion, Defendants first argue that the Eighth Amendment, not the Fourteenth Amendment, provided the constitutional protection for Davis to be free from cruel and unusual punishment at the time of his death. (ECF No. 39-2 at PageID 204–206; ECF No. 46 at PageID

7

655–56.)  The applicable constitutional protection turns on whether Davis was a pretrial detainee or a convicted inmate at the time of his death.  Following consideration of that issue, the Parties' arguments about whether there is a genuine issue of material fact as to Davis's alleged objectively serious medical need and whether the officers recklessly failed to mitigate the risk the serious medical need posed to Davis are considered.

    A.    Pretrial Detainee or Convicted Inmate

The Fourteenth Amendment protects individuals who are pretrial detainees, while the Eight Amendment covers convicted prisoners.  See Kingsley v. Hendrickson, 576 U.S. 389, 400 (2015); Brawner v. Scott County, 14 F.4th 585, 596 (6th Cir. 2021).  Here, Davis was found guilty of first-degree murder and other crimes in December 2021.  (ECF No. 39-1 at PageID 196–97.)  He was sentenced to life in prison on February 23, 2022, (id. at PageID 197), and then died four days later on February 27.  (Id. at PageID 198.)

 "'Final judgment in a criminal case means sentence.  The sentence is the judgment.'" Burton v. Stewart, 549 U.S. 147, 156 (2007) (quoting Berman v. United States, 302 U.S. 211, 212 (1937)).  After sentencing and the entry of final judgment, a defendant's status converts from pretrial detainee to convicted prisoner.  See Shuler v. Hall, No. 3:18-cv-01223, 2019 WL 1777899, at *8 (M.D. Tenn. Apr. 23, 2019) (acknowledging that the Eighth Amendment applies to "individuals who have been tried, convicted, and sentenced"); see, e.g., Lewis v. Downey, 581 F.3d 467, 473 (7th Cir. 2009) ("[I]t is unlikely that Lewis, who was awaiting sentencing and the entry of final judgment, had yet accrued Eighth Amendment protections.  Instead, Lewis's claims should have been framed in terms of the Fourteenth Amendment's Due Process Clause.")

Davis was sentenced on February 23, four days before his death.  However, in Tennessee, a judgment does not become final until thirty days after its entry.  State v. Green, 106 S.W. 3d

646, 648 (Tenn. 2003); cf. Freeman v. Wainwright, 959 F.3d 226, 229 (6th Cir. 2020)

("Freeman's sentence became final . . . when he did not appeal within thirty days" in Ohio state

court).

While the term "pretrial detainee" is a misnomer as applied to Davis's case when trial

had taken place, a sentence was imposed, and judgment had been rendered, he was still protected

by the Fourteenth Amendment at the time of his death because that judgment had not yet become

final.  Therefore, Davis was still protected by the Fourteenth Amendment on the day of his death.

B.     Potential Constitutional Violation by Officers

Because § 1983 is not a standalone claim, see Baker, 443 U.S. at 140, Westbrooks needs

a constitutional hook for her claim; she alleges that the officers acted with deliberate indifference

in violating Davis's constitutional right to receive adequate care under the Fourteenth

Amendment.  (ECF No. 1 at PageID 13–14.)  For this constitutional violation, a reasonable jury

must be able to find that Davis (1) "had an objectively serious medical need" and (2) the

officers' "action (or lack of action) was intentional (not accidental)" because they either

intentionally ignored the serious medical need or "recklessly failed to act reasonably to mitigate

the risk the serious medical need posed . . . even though a reasonable official . . . would have

known that the serious medical need posed an excessive risk" to the health and safety of Davis.

Brawner v. Scott County, 14 F.4th 585, 597 (6th Cir. 2021).

1.     Objectively Serious Medical Need

An objectively serious medical need is "one that has been diagnosed by a physician as

mandating treatment or one that is so obvious that even a lay person would easily recognize the

necessity for a doctor's attention."  Harrison v. Ash, 539 F.3d 510, 518 (6th Cir. 2008) (cleaned

up).  Davis suffered a drug overdose, but had no prior history of drug use in the Jail; accordingly,

he did not have a diagnosis from a physician mandating treatment.  The second avenue for establishing a medical need—one that is so obvious that a lay person would recognize the need—is typically observed through external or physical signs of distress.  See Grote v. Kenton County, 85 F.4th 397, 406 (6th Cir. 2023).  Drug-induced symptoms that lead to overdose can fit that criterion.  Id.

Obvious signs of overdose in similar cases include a detainee being "bent at the waist, swaying and rocking on the bench inside his cell, grabbing his head and midsection, dropping his sandwich numerous times, and falling to the floor repeatedly."  Burwell v. City of Lansing, 7 F.4th 456, 464 (6th Cir. 2021).  "Nodding out," or having a hard time staying awake, is also evidence of a potential overdose, as is vomiting, diarrhea, and a detainee lying on the floor. Burwell, 7 F.4th at 464.  An inmate who was slumped over, had red eyes, exhibited difficulty walking, and was slurring his speech showed signs of an objectively serious medical need. Border v. Trumbull Cnty. Bd. of Comm'rs, 414 F. App'x 831, 837–38 (6th Cir. 2011).  Yet another detainee had a "visibly" serious medical condition because he was "lying face down on the floor of his cell, almost comatose, unresponsive and having seizure-like spasms."  Bertl v. City of Westland, No. 07-2547, 2009 WL 247907, *5–6 (6th Cir. Feb. 2, 2009).

There are situations where a serious medical need is so obvious to a lay person that she would recognize a doctor's attention is warranted; all of the above examples include visual clues that an officer or lay person could see.  Here, Westbrook does not argue that Davis exhibited physical symptoms.  Instead, Davis kicked his cell door and yelled that he felt threatened and was being hunted.  Three separate officers talked to Davis and observed his behavior.  Over fifteen visits were made to his cell over the course of five hours.  Davis was conversational and could speak to the officers.  Someone experiencing an overdose, certainly in the latter stages,

would not be able to converse with officers on fifteen different occasions over a multi-hour period.

The report of Westbrook's expert, Dr. Kenneth Stein—who is a physician with nearly three decades of experience in emergency and critical care medicine in Missouri—states that methamphetamine "factors for mortality include coma, shock, body temperature >39°C, acute renal failure, metabolic acidosis, and hyperkalemia . . . . Clinicians should anticipate clinical deterioration and cardiac arrest in any wildly agitated patient, particularly those requiring physical restraints to maintain safety."  (ECF No. 44-5 at PageID 518–19.)  Effective "[c]ontrol of agitation and hyperthermia comprise the core of the acute management of methamphetamine intoxication."  (Id.)  Westbrook does not aver that Davis was exhibiting these physically observable symptoms.

Although Dr. Stein states in his opinion that Davis "was showing signs of drug intoxication / agitated delirium from methamphetamine use," he does not specify what those signs were.[9]  (Id. at PageID 518.)  Rather, he only states that the behaviors observed by Defendants were consistent with methamphetamine overdose or delirium.  (Id.)  Without a specific statement that Davis had an objectively serious medical need, as well as the basis for that statement, there is no evidence of a genuine issue of material fact as to whether he was showing signs of an objectively serious medical need.

A reasonable officer would be required to escalate a concern to a medical professional if he observed (or was told of) a serious medical need.  Instead, officers escalated their calls for assistance to Williams because Davis was worried about gang activity, not his health.  Because

---

[9] Because Cameron Lindsay, a former warden who is a corrections expert, does not have the medical expertise to opine on whether Davis was showing symptoms of a serious medical need, his opinion is not considered.

he never asked for medical assistance and a serious medical need was not obvious, either to multiple trained officers or a layperson, a health professional was never called to evaluate Davis.

The evidence is so one-sided that a reasonable jury could not find that Davis had an objectively serious medical need that was obvious to a layperson. Therefore, his constitutional violation falls short on the first prong.

2.    Intentionality and Mitigating the Risk of the Medical Need

While the analysis could stop here because Davis was not suffering from a serious medical need that was obvious to a layperson, the second prong of the test evaluates whether the officers' "action (or lack of action) was intentional (not accidental)" and whether they "recklessly failed to act reasonably to mitigate the risk the serious medical need posed . . . even though a reasonable official . . . would have known that the serious medical need posed an excessive risk." Brawner v. Scott County, 14 F.4th 585, 597 (6th Cir. 2021). A plaintiff must show action or inaction that is "more than negligence but less than subjective intent—something akin to reckless disregard." Id. at 596.

The risk of overdose and how an officer mitigates that risk varies by context. The likelihood of an overdose is greater for a detainee who was just recently apprehended versus one who is sentenced. For example, a reasonable official would be more likely to consider the risk of overdose if a defendant was arrested that night and his behavior from earlier in the night is unknown to the official. Cf. Hyman v. Lewis, 27 F.4th 1233, 1236 (6th Cir. 2022). In Hyman, an individual was arrested around 8:50 p.m. and later died of a drug overdose at 3:50 a.m. when detained in jail. Id. While the detainee denied being under the influence of drugs upon booking and the officers did not find any evidence of contraband on him, there was no way for the officers to conclusively verify what had transpired earlier in the night for Hyman. Id. After his

12

death, cocaine, heroin, and fentanyl were found in the detainee's rectum.  Id.  However, even in that situation, the Sixth Circuit reasoned that the officers' actions "were not reckless" as the plaintiff could not point to evidence that the officers "intentionally ignored Lipford's needs."  Id. at 1237.

It is easy to "Monday morning quarterback" a situation after it has happened, but Westbrook cannot show that the officers intentionally ignored or recklessly disregarded Davis's behavior and requests.  On the contrary, Parker visited Davis at least fifteen times from 11:01 p.m. to 4:18 a.m., which is a sign of intentional action in an attempt to remedy the noise and Davis's verbal fears.  At least four officers were apprised of the situation.  And three separate officers did not see an indication of a serious medical need that warranted attention over the period of more than five hours.

Furthermore, Davis had been incarcerated for several years, was not arrested for a drug-related crime, and did not have any history of drug use while being detained.  He also never asked for medical attention during the plethora of visits that were made to his cell.  The officers continued to come by his cell and talk to him, and got a second opinion, bringing in other officers for support.  Kicking cell doors, feeling threatened, and yelling about being hunted are not overt signs of a drug overdose.  The undisputed evidence indicates that the officers acted reasonably in trying to calm down Davis and were not reckless in failing to mitigate any potential serious medical need.

Parker did not fully make his rounds or document where he went on the fourth floor during the last hour-and-a-half of his overnight shift.  However, failing to make and record all required rounds on its own does not amount to a constitutional violation, especially when the officer did not intentionally ignore the needs of an inmate.  See Hyman v. Lewis, 27 F.4th 1233

13

(6th Cir. 2022) (reasoning that an officer who failed to make all of the required inmate checks did not violate a detainee's constitutional rights because there was no evidence that the officer "intentionally ignored Lipford's needs")

Lastly, Davis had been confined in the Jail for multiple years before his death date. He did not have ready access to contraband because he was detained. Methamphetamine is an illegal drug that cannot be obtained or possessed by non-incarcerated individuals, much less by those who are incarcerated; someone who is incarcerated and has been stripped of most of his freedoms has an even more difficult time obtaining an illegal substance like methamphetamine. When the undisputed evidence indicates that an individual has no prior evidence of drug use, drugs are illegal, drugs are difficult to obtain, drugs are even more difficult to smuggle into a prison and then transfer to a specific inmate, there are no physical signs of distress, a health professional was not requested by the inmate, at least fifteen unique visits were made to check in on the inmate, and three separate individuals observed and spoke with the inmate, no reasonable jury could find that the situation rises to a constitutional violation.

It cannot be said that Parker and the other officers "recklessly failed to act reasonably to mitigate the risk the serious medical need posed . . . even though a reasonable official . . . would have known that the serious medical need posed an excessive risk" to Davis's health and safety. See Brawner, 14 F.4th at 597. The evidence here is so one-sided that Defendants prevail as a matter of law. Thus, the motion for summary judgment as to the individual officers is **GRANTED**.

C.    State Law Claims

Westbrook abandoned her state law claims against the officers for negligence under Tennessee's Governmental Tort Liability Act and against all Defendants for loss of consortium

(ECF No. 44 at PageID 450), and thus the Court need not address that portion of the Shelby County Defendants' motion.

## II.    Claims Against Municipality

When a § 1983 claim is made against a municipality such as Shelby County, the Court must analyze two distinct issues: (1) whether Plaintiff's harm was caused by a constitutional violation; and (2) if so, whether the municipality as an entity is responsible for that violation. Scott v. Wittaker, No. 1:23-CV-P172-JHM, 2024 WL 1837978, at *3 (W.D. Ky. Apr. 26, 2024) (citing Collins v. City of Harker Heights, 503 U.S. 115, 120 (1992)). A municipality can be held responsible if a plaintiff was deprived of a constitutional or statutory right as a direct result of "a policy, procedure, or custom" of the municipality. City of Canton v. Harris, 489 U.S. 378, 385 (1989).

### A.    Municipal Liability Absent Individual Liability

As stated in a recent order,[10] a § 1983 violation is typically predicated on an individual's unconstitutional conduct. However, a municipality can be held liable even when there is no constitutional violation by an individual officer. See Grote v. Kenton Cnty., 85 F.4th 397, 414 (6th Cir. 2023). While the Supreme Court stated in City of Los Angeles v. Heller that a damages award against a municipality is unwarranted "based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm," 475 U.S. 796, 799 (1986) (per curiam), Heller does not preclude a finding of municipal liability where constitutional harm has nonetheless "been inflicted upon the victim" and the municipality is responsible for that harm. See Grote 85 F.4th at 414 (6th Cir. 2023); Epps v. Lauderdale County, 45 F. App'x 332, 334 (6th Cir. 2002) (Cole, J., concurring); see also, e.g., North v. Cuyahoga

---

[10] See Ragland v. Shelby County, No. 2:22-cv-2862 ECF No. 69 at PageID 888–891 (W.D. Tenn. July 17, 2024).

County, 754 F. App'x 380, 389–90 (6th Cir. 2018) (surveying the approaches of several judicial circuits); Fairley v. Luman, 281 F.3d 913, 917 (9th Cir. 2002) (per curiam) ("If a plaintiff establishes he suffered a constitutional injury by the City, the fact that individual officers are exonerated is immaterial to liability under § 1983.") (emphasis in original); Speer v. City of Wynne, 276 F.3d 980, 986 (8th Cir. 2002) ("Heller should not be read to require a plaintiff to show more than that a governmental policy or custom was the 'moving force' that led to the deprivation of his constitutional rights, the foundation for municipal liability.").

The Sixth Circuit has not directly addressed whether a municipality can be held liable absent a constitutional violation by an individual, and its discussions in dicta "ha[ve] not been a model of consistency." Grote, 85 F.4th at 414. In Bowman v. Corrections Corp. of Am., 350 F.3d 537 (6th Cir. 2003), a detainee was treated by jail medical providers but ultimately died. 350 F.3d at 545. The plaintiff alleged that the defendants' policies and failure to investigate were themselves unconstitutional and led to this death. Id. The jury found that the two doctors who treated the detainee did not act with deliberate indifference to the detainee's medical needs and, therefore, did not violate his constitutional rights. Id. at 544. As a result, the district court found that the municipal defendant was not liable either. On appeal, the Sixth Circuit upheld the decision, reasoning that "the constitutional violation claimed either occurred or did not occur as a direct result of the actions of at least one person." Id. at 546. As a result, it was not necessary to reach the question of whether direct municipal liability can exist without individual liability. Id. However, in dicta, the court suggests that municipal liability cannot exist without individual liability. See id. at 545 ("[T]he district court held that without a constitutional violation of Anthony's Eighth Amendment right by Dr. Coble or Warden Myers, CCA cannot be held liable for its policy, even if it were to encourage deliberate indifference. We agree.")

16

More recently, however, the Sixth Circuit discussed this issue in <u>Grote v. Kenton County</u>, 85 F.4th 397, 414 (6th Cir. 2023).  There, the court acknowledged that, "[i]n many cases, a finding that no individual defendant violated the plaintiff's constitutional rights will also mean that the plaintiff has suffered no constitutional violation."  <u>Grote</u>, 85 F.4th at 414 (quoting <u>North v. Cuyahoga County</u>, 754 F. App'x 380, 390 (6th Cir. 2018)).  However, in cases of constitutional violations that result from systematic problems related to official customs, policies, or practice, a municipality can still be held liable.  <u>Id.</u>  ("[W]hen the constitutional harm complained of relates to lack of action due to a failure to train, the municipality may still be liable."); <u>see</u> <u>also</u> <u>Daniel v. Cook County</u>, 833 F.3d 728, 734 (7th Cir. 2016) (considering whether municipality was liable for constitutional violation despite inability to hold any one doctor responsible because the plaintiff "contends . . . that the delays and confusion that caused his injury were caused by systemic problems in the health care system for the Cook County Jail that reflect deliberate indifference to inmates' health needs as a matter of official custom, policy, or practice").  Following the dicta in <u>Grote</u>, "it is proper to consider possible constitutional violations committed by a municipality <u>qua</u> municipality, even in the absence of a showing of a constitutional violation of any one individual officer."  85 F. 4th at 414.  Thus, Shelby County can be found liable absent a violation by an individual officer.

B.    Policy, Procedure, or Custom of Understaffing

Westbrook argues that Defendant Shelby County "implemented customs and policies . . . in the operation of a jail that was unconstitutionally overcrowded . . . such that inmates, including the Decedent, were not in a reasonably safe environment, could not access staff during emergencies, and could not access emergency medical care when necessary."  (ECF No. 1 at PageID 13.)  When suing a municipality under § 1983, a plaintiff must prove that he was

deprived of his constitutional or statutory rights as a direct result of "a policy, procedure, or custom" of the municipality. City of Canton v. Harris, 489 U.S. 378, 385 (1989). "A litigant can show a policy or custom through reference to: (1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." Agema v. City of Allegan, 826 F.3d 326, 331 (6th Cir. 2016).

In cases where no formal policy exists, "the critical question is whether there is a particular custom or practice that 'although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law.'" Jones v. Muskegon County, 625 F.3d 935, 946 (6th Cir. 2010) (quoting Ford v. County of Grand Traverse, 535 F.3d 483, 495–97 (6th Cir. 2008)). To state a municipal liability claim under an "inaction" theory, Westbrook must show:

(1) the existence of a clear and persistent pattern of violating federal rights . . . ;
(2) notice or constructive notice on the part of defendants;
(3) the defendants' tacit approval of the unconstitutional conduct, such that their deliberate indifference in failing to act can be said to amount to an official policy of inaction; and
(4) that the defendants' custom was the "moving force" or direct causal link for the constitutional deprivation.

Powers v. Hamilton Cnty. Pub. Def. Comm'n, 501 F.3d 592, 607 (6th Cir. 2007). However, "[a] plaintiff cannot establish a custom solely by pointing to the facts of his own case"; rather, he must show "several separate instances" of similar misconduct. Payne v. Sevier County, 681 F. App'x 443, 446 (6th Cir. 2017) (quoting Thomas v. City of Chattanooga, 398 F.3d 426, 433–34 (6th Cir. 2005)).

Both Parties agree that the Jail was not fully staffed on the night of Davis's death. Westbrook emphasizes the understaffing of the Jail and the lack of adequate supervision on the

night in question.  Those arguments would be most applicable in situations where inmates are mingling together and adequate supervision is paramount to preventing any disturbances or fights between inmates.  Here, on the contrary, Davis was safely housed in his cell.

There also was no shortage of interactions with Davis as he did not appear to have difficulty reaching staff, even on an understaffed night.  Davis was able to speak to staff on at least fifteen different occasions over the course of five hours.  Three officers spoke to him directly, and at least four officers were aware of the commotion and verbal requests that Davis had made.  He had not expressed a desire for medical care, nor had he exhibited external signs that would prompt a reasonable officer to believe a drug overdose was possible.  Westbrook avers that "if the Jail had been properly staffed, another security officer [besides Parker] might have recognized that Mr. Davis was suffering an objectively serious medical need and called for a healthcare professional to evaluate Mr. Davis."  (ECF No. 44 at PageID 448.)  But two other officers outside of Parker did speak with Davis, and neither one saw the need to call for a healthcare professional.  Rather, as discussed supra, there is no evidence of an objectively serious medical need.

Ultimately, Westbrook's claim fails on the first element; she does not show a clear pattern of Shelby County being deliberately indifferent to serious medical needs in violation of pretrial detainees' (or convicted inmates') constitutional rights.  This situation does not meet that definition, and she does not cite a single analogous factual scenario in her response.  Instead, she references a myriad of understaffing statistics and trends.  (ECF No. 44 at PageID 445–48.) Westbrook has just "point[ed] to the facts of [her] own case" and has not given "several separate instances" of similar misconduct or evidence of a pattern.  See Payne, 681 F. App'x at 446. Therefore, her custom and policy arguments fail as a matter of law.

C.    Failure to Train Officers on Methamphetamine Overdose Symptoms

In the alternative, Westbrook argues that Shelby County "failed to properly hire or train its agents and employees with respect to their responsibilities in ensuring that they provide reasonable medical care." (ECF No. 1 at PageID 12.)  To find a county liable for failing to train its employees, a plaintiff must show "(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." Winkler v. Madison County, 893 F.3d 877, 902 (6th Cir. 2018).  Focusing on the second element, the question is whether, viewing the facts in the light most favorable to Westbrook, the inadequacy in training was the result of Shelby County's deliberate indifference.

Two situations can bring about the potential for deliberate indifference.  First is the "failure to provide adequate training in light of foreseeable consequences that could result from a lack of instruction." Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist., 455 F.3d 690, 700–01 (6th Cir. 2006) (cleaned up).  Second is when a municipality "fails to act in response to repeated complaints of constitutional violations by its officers." Id. at 701.

The undisputed facts in this case dictate the outcome on the first prong.  Officers need training on numerous different subject matters to adequately perform their jobs.  Westbrook avers that they should be able to notice the specific symptoms of a methamphetamine overdose. (ECF No. 44 at PageID 444.)  Officers testified to being aware of fentanyl overdose symptoms, but not the nuances of a methamphetamine overdose.  (Id. at PageID 443.)  As previously stated, Westbrook's expert's report stated that methamphetamine overdose symptoms "include coma, shock, body temperature >39°C, acute renal failure, metabolic acidosis, and hyperkalemia. . . . Clinicians should anticipate clinical deterioration and cardiac arrest in any wildly agitated patient

. . . . Control of agitation and hyperthermia comprise the core of the acute management of methamphetamine intoxication."  (ECF No. 44-5 at PageID 518–19.)

Ideally, officers would have training in all potential aspects that could affect a detainee's life.  However, here, Davis was not plainly exhibiting physical signs of overdose.  He did not go into a coma or complain about his body temperature.  He, instead, worried that he was being hunted and wanted to be transferred to another pod because of gang-related fears.

Additionally, there was not just one officer, but rather three who talked to Davis and did not see concerning health issues that needed to be elevated to a medical professional.  Those officers reasonably responded to what they observed and what Davis was telling them.  Even on the night in question, according to Westbrook, officers acted in Davis's very pod when an inmate's behavior rose to a level of needing attention; Varner came to the pod to transfer another inmate who was suicidal.  Davis's behavior and concerns never got to that point.  Lastly, Davis never asked for medical assistance during the fifteen (or more) visits he had with officers.  The ultimate consequence that Davis suffered, as tragic as it was, was not foreseeable based on the symptoms he exhibited and the training that the officers had to elevate serious medical needs.

The undisputed evidence indicates that not only was Davis's condition not foreseeable, even with training, but Westbrook also does not allege other complaints around failing to train officers to notice the signs of methamphetamine overdose.  She simply relies on the facts of Davis's case.  Therefore, there is no evidence of repeat instances here.

Shelby County did not enact policies or customs that caused a violation of Davis's constitutional rights or fail to train its employees in violation of Davis's constitutional rights. Thus, the Shelby County Defendants' Motion for Summary Judgment is **GRANTED**.  Counts

one and two are **DISMISSED WITH PREJUDICE**, including as to Defendants Bonner and Fields.[11]

### III.   Defendant Sheriff Bonner and Chief Jailer Fields's Motion for Judgment on the Pleadings

In their Motion for Judgment on the Pleadings, Defendants Sheriff Bonner and Chief Jailer Fields argue that they were not personally involved in any of the events concerning Davis's death, they cannot be held liable as supervisors, they are entitled to qualified immunity, and the understaffing of the Jail cannot rise to a constitutional violation that would impose individual liability on either of them.  (ECF No. 38-1 at PageID 187–92.)  Westbrook takes the opposite stance on each argument in her response.  (ECF No. 45.)

While Bonner and Fields were not a party to the Shelby County Defendants' Motion for Summary Judgment (ECF No. 39), the underlying issues in count one in common between these motions, including whether Shelby County, Bonner, or Fields implemented policies and customs that violated Davis's constitutional rights or failed to train its agents or employees, have already been decided.  Because Davis did not suffer a constitutional violation based on the undisputed facts, and the relevant claims from count one of the complaint (ECF No. 1 at PageID 12–13), that involved Shelby County, Sheriff Bonner, and Chief Jailer Fields have already been dismissed, Defendant Bonner and Chief Jailer Fields's Judgment on the Pleadings is **DENIED AS MOOT**.

---

[11] While Bonner and Fields were not direct parties to the Shelby County Defendants' Motion for Summary Judgment (ECF No. 39), the non-existence of a violation of Davis's constitutional rights negates any potential claim against Bonner and Fields.  Count one of Westbrook's complaint was against "Shelby County, Defendant Bonner, and Defendant Fields." (ECF No. 1 at PageID 12.)  The paragraphs in that count begin with "Defendant Shelby County, acting by and through its policymakers, officers, and agents," as opposed to averring any unique claims against Bonner and Fields.  (Id.)  The more liberal standard of review for a motion for judgment on the pleadings is moot here because there are not any unique facts to be analyzed that apply just to Bonner and Fields that do not also apply to Shelby County.

## <u>CONCLUSION</u>

For these reasons, Defendants Michael Parker, Antonio Buford, Natasha Williams, Filmore Varner, and Shelby County, Tennessee's motion for summary judgment is **GRANTED**, the first two counts in Westbrook's complaint concerning 42 U.S.C. § 1983 are **DISMISSED WITH PREJUDICE** as to all Parties, and Defendants Floyd Bonner and Kirk Fields's motion for judgment on the pleadings is **DENIED AS MOOT**.  The latter two state law claims were abandoned by Westbrook.

**IT IS SO ORDERED,** this 30th day of August, 2024.

s/ Sheryl H. Lipman
SHERYL H. LIPMAN
CHIEF UNITED STATES DISTRICT JUDGE

23